**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ED DALE,**<br><br>                    **PLAINTIFF,**<br><br>        **v.**<br><br>**VERTEX, INC.,**<br><br>                    **DEFENDANT.** | **Civil Action No. _____**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Ed Dale, by and through his attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1.      This is an action for an award of damages and other relief on behalf of Plaintiff Ed Dale (hereinafter "Plaintiff" or "Mr. Dale"), a former employee of Vertex, Inc. (hereinafter "Vertex" or "Defendant"). Despite his loyalty and consistent performance, Mr. Dale was subjected to egregious discrimination and harassment on the basis of his disability and/or perceived disability and was retaliated against for complaining about discrimination and harassment.

2.      This action arises under the American with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA").

## JURISDICTIONAL STATEMENT

3.      This Court has original jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States pursuant to 29 U.S.C. §§ 1331 and 1391.

4.      The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5.      This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

6.      All conditions precedent to the institution of this suit have been fulfilled. On November 6, 2020, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC"). On July 26, 2021, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice.[1]

## **VENUE**

7.      This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

8.      This action properly lies in the Eastern District of Pennsylvania because significant activities associated with the claims alleged took place in this jurisdiction and because Plaintiff was employed and terminated by Defendant in this jurisdiction.

---

[1] It has been less than one year since Mr. Dale dual-filed his Charge of Discrimination as a Complaint with the Pennsylvania Human Relations Commission for Defendant's violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"). Mr. Dale will seek to amend his Complaint in this matter to add his PHRA claims once he has exhausted his administrative remedy with respect to those claims.

## PARTIES

9.      Plaintiff Ed Dale is an adult male citizen and resident of Miami Beach, Florida and the United States of America.

10.     Mr. Dale is a qualified individual with a disability within the meaning of the ADA.

11.     Mr. Dale's disability affects a major bodily function and substantially limits one or more major life activities.

12.     Mr. Dale's disability has affected him for a period far in excess of six months.

13.     During his employment, Defendant regarded Mr. Dale as disabled.

14.     Defendant Vertex, Inc. is a Pennsylvania corporation with a principal place of business located at 2301 Renaissance Boulevard, King of Prussia, Pennsylvania 19406.

15.     At all relevant times, Defendant is and has been an employer employing more than 100 employees.

16.     At all relevant times, employees of Defendant acted as agents and servants for Defendant.

17.     At all relevant times, employees of Defendant were acting within the scope of their authority and in the course of their employment under the direct control of Defendant.

18.     At all times material hereto, Defendant acted by and through its authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

19.     At all relevant times hereto, Plaintiff was an "employee" of Defendant within the meanings of the laws at issue in this suit and is accordingly entitled to the protection of said laws.

20.     At all relevant times hereto, Defendant was an "employer" and/or "person" under the laws at issue in this matter and is accordingly subject to the provisions of said laws.

21.     This Honorable Court has personal jurisdiction over the Defendant.

## FACTS

22.     Plaintiff Ed Dale is a skilled and experienced sales representative with over two decades of accomplishments in his field, who has consistently received accolades, awards and other acknowledgement of his stellar performance.

23.     Beginning on April 20, 1995, Mr. Dale was employed full-time as a PC Support Analyst at Vertex.

24.     Although Mr. Dale began his employment with Vertex as a PC Support Analyst, throughout his more than twenty-five (25) years of employment with Defendant, Mr. Dale received a number of promotions, including promotions to Telesales Representative, Inside Sales Representative, Outside Sales Representative (Account Executive), and Senior Account Executive, Tax Technology.

25.     Mr. Dale held his most recent position with Vertex, the position of Senior Account Executive, Tax Technology, for approximately seventeen (17) years, since 2003.

26.     For the past several years, Mr. Dale has reported to Mike Cassidy, Director of Corporate Sales.

27.     Throughout his tenure with Vertex, Mr. Dale proved himself to be a successful, hardworking, capable and reliable employee.

28.     At all times during his employment, Mr. Dale communicated appropriately and respectfully with his colleagues, followed Vertex's sales policies, and acted as a team player.

29.     Unfortunately, in or about April 2009, Mr. Dale was diagnosed with Multiple Myeloma, a disability.

30.     Due to this disability, Mr. Dale was forced to take a short-term medical leave for three (3) months, from December 2009 through March or April 2010, and had a stem cell transplant during that time.

31.     Mr. Dale had given Chris Jones, Vertex Chief Revenue Officer, a note from his oncologist at that time, stating that there may be times that Mr. Dale did not feel well and should work from home.

32.     Vertex was thus well aware of Mr. Dale's medical condition and disability, and knew that he may have to work remotely at times due to his disability.

33.     Despite this knowledge, Vertex failed to provide any web-conferencing or other accommodations to allow Mr. Dale to attend meetings when his disability compelled him to work from home.

34.     In yet another instance of discrimination, Vertex claimed that Mr. Dale had acted inappropriately in leaving a workshop one day early due to predictions of heavy snow and blizzard like conditions, even though he did not have enough of his chemotherapy medication with him in the event that he got stranded, he received express permission from Penny Vennerholm, the former Vice President of Sales, to use his best judgment to get home safely, and Vertex approved the expense for another employee to rent a car to leave the workshop early and drive from Pennsylvania to his home in North Carolina.

35.     In addition, in or about 2011, Mr. Dale had missed two sales meetings due to his medical condition and doctor's appointments, which Mr. Dale had communicated to Ms. Vennerholm.

36.     Despite his disability and the short-term leave he had taken, Mr. Dale continued to work hard and achieve tremendous success.

37.     In addition to his history of promotions at Defendant, Mr. Dale received significant bonus payments in recognition of his outstanding sales record.

38.     In his position, Mr. Dale was assigned certain annual business quotas.

39.     Mr. Dale was a consistently high performer who almost always exceeded his set quota amounts.

40.     Mr. Dale's average performance over the course of his tenure was well above 100 percent of quota.

41.     In 2019, for example, Mr. Dale exceeded 150% of quota, qualifying him for the "Peak Performance Club," a company-sponsored trip each year to reward exceptional, top performers.

42.     In fact, when engaged in sales positions at Vertex, Mr. Dale generated approximately $70 million dollars to $100 million dollars or more in revenue for Defendant, which included both new sales and annual renewal/subscription fees.

43.     Moreover, Mr. Dale's annual performance reviews were consistently excellent, including comments, among others, that Mr. Dale was "friendly," "customer-centric," "strategic in nature," and that he prepared his team well in advance.

44.     Mr. Dale maintained strong relationship with scores of global customers as well as Defendant's software and Big 4 partner alliance partners.

45.     On several occasions, Mr. Dale voluntarily offered his services in mentoring and training new Vertex sales department hires.

46.     Notwithstanding Mr. Dale's proven record of success and consistently excellent job performance, since the arrival of a new Head of Sales in or about 2017, Mr. Dale was repeatedly subjected to egregious discrimination and harassment on the basis of his disability.

47.     During his first twenty-two years with Defendant, Mr. Dale was never written up, criticized, or given any oral or written warnings.

48.     That changed, however, upon the arrival of a new manager, Carlo Cautilli, and particularly, upon Mr. Cautilli's discovery of Mr. Dale's medical condition and disability.

49.     Specifically, in or about 2017, Mr. Cautilli was hired as Defendant's Senior Director of North American Sales/Head of Sales.

50.     Mr. Cautilli was expected to take over the position of Vice President of Sales, as the then-Vice President of Sales, Penny Vennerholm (with whom Mr. Dale had an excellent working relationship) had a terminal illness.

51.     Mr. Cautilli, who previously worked for a Vertex competitor, has since hired several of his former co-workers to work at Vertex as well.

52.     After Mr. Cautilli's hire at Vertex, Mr. Cautilli became Mr. Dale's sponsor/mentor, a role previously filled by Ms. Vennerholm.

53.     Mr. Cautilli became Mr. Dale's sponsor when Mr. Dale's previous sponsor, Ms. Vennerholm, was diagnosed with Lung Cancer; at that time, Mr. Dale requested that Mr. Cautilli be his new sponsor, and Mr. Cautilli agreed.

54.     Mr. Cautilli was made aware of Mr. Dale's medical condition and disability.

55.     When it was agreed that Mr. Cautilli would be Mr. Dale's sponsor, they coordinated a call and discussed various topics, including Mr. Dale's medical condition.

56.     Mr. Cautilli also would have been made aware of Mr. Dale's medical condition and disability because Mr. Dale was on medical leave for a week in October or November 2020, and Mr. Cautilli would have been notified about the medical leave due to his being the VP of Sales at the time.

57.     During a discussion with Mr. Cautilli, Mr. Dale disclosed his medical condition, and Mr. Cautilli expressed open concern about Mr. Dale's ability to perform his duties with his disability.

58.     Thereafter, Mr. Dale attempted to schedule a follow-up discussion with Mr. Cautilli through a calendar invite, which Mr. Cautilli declined.

59.     Mr. Dale then sent another invite, specifying that he wished to discuss his medical condition, which Mr. Cautilli again declined, this time by instructing a colleague to tell Mr. Dale that he was not available.

60.     Thereafter, immediately upon beginning his employment with Vertex, and with the knowledge of Mr. Dale's medical condition and disability, Mr. Cautilli engaged in a pattern of severe discrimination and harassment against Mr. Dale.

61.     Notably, despite his years of service without issue, warning or problem, Mr. Dale was suddenly the target and recipient of various unwarranted and unjustified criticisms and warnings originating with Mr. Cautilli.

62.     Further, Defendant claims that Mr. Dale had behavioral issues years prior to this time; however, it was not until Mr. Dale was required to work for Mr. Cautilli, who held a

discriminatory animus against Mr. Dale based on his disability, that his alleged "behavioral issues" became a significant issue for Defendant.[2]

63.      For example, in or about May or June 2019, Mr. Dale spoke at a team meeting and included a friendly joke with his Quarterly Business Review (QBR).

64.      This meeting was held shortly after Mr. Cautilli began his employment with Vertex, and there were very few guidelines or templates given regarding the meeting other than to discuss one's individual sales plan, including current sales, future sales, gaps, improvements needed to help sales, and overall commentary.

65.      Mr. Dale was thereafter informed that Mr. Cautilli had been unhappy with Mr. Dale and the meeting.

66.      Mr. Cassidy specifically emailed Mr. Dale to report that Mr. Dale's joke made during the meeting, which Mr. Cassidy acknowledged did not have any negative intent, created an "awkward situation" which "some did not appreciate."

67.      Mr. Cassidy informed Mr. Dale that Mr. Cautilli had demanded that he write the email, further evidencing the discriminatory animus of Mr. Cautilli towards Mr. Dale.

68.      Mr. Dale, although surprised by this response, indicated that he would act differently at upcoming meetings, as he now understood what was to be required in such meetings and would follow accordingly from that point on.

69.      Mr. Cassidy noted that he appreciated Mr. Dale's acknowledgement of the feedback in a positive way and agreement to bring a different approach to the next meeting.

---

[2] Mr. Dale was diagnosed with his disability in or about 2009, and Defendant claims that his "behavioral problem" began in 2011 – further demonstrating discriminatory animus on the part of Defendant.

70.     Mr. Dale continued to perform consistently and in an excellent and successful manner.

71.     However, on or about August 23, 2019, Mr. Dale received a notice that his consistently-used approach for sales, which included a deviation from typical pricing and discounting procedures, had been questioned by Mr. Cautilli and that Mr. Dale would thereafter be required to seek appropriate approvals going forward.

72.     Throughout his employment, Defendant had generally given Mr. Dale great autonomy to conduct his sales and this was the first time that Mr. Dale had received any censure for his methods.

73.     In fact, Mr. Dale had not acted inappropriately when deviating from pricing and discounting procedures with respect to his clients, Georgia Pacific and O'Neal.

74.     The Georgia Pacific account had a long sales cycle.

75.     Mr. Cassidy had given Mr. Dale verbal approval for the six-month extended term and discount to secure the deal initially.

76.     The deal for Georgia Pacific and approval for the extended term and discount occurred before the rules went through a change process within Vertex.

77.     When the deal finally came in, the terms had already been included since it was offered initially, of which Mr. Cassidy had approved and was aware.

78.     Mr. Cassidy had even stated that he would explain that the extension had been offered to the client prior to the Vertex change processes, and the deal was approved internally.

79.     Mr. Cassidy apologized to Mr. Dale that he did not send an internal email prior to the deal being closed, since he had forgotten that he had given the approval earlier on, and he

requested to Vertex that the deal be grandfathered in since it had taken place prior to the tightening of the rules.

80.     Regarding the email sent by Mr. Cassidy to Mr. Dale admonishing Mr. Dale's deviation from pricing and discount procedures, Mr. Cassidy again informed Mr. Dale that he had been required to send the email per the specific instructions of Mr. Cautilli.

81.     Notably, another Sales Representative went outside the concession guidelines the following month, but, unlike Mr. Dale, was not given any warnings or reprimands for doing so.

82.     Mr. Dale wrongfully received a Final Written Warning dated September 6, 2019.

83.     The "Final Written Warning" referenced minor and explaining incidents and was further evidence of discrimination and retaliation against Mr. Dale.

84.     The Final Written Warning references "disrespectful behavior directed at Vertex employees, partners or clients; specifically referencing behaviors on 8/29."

85.     Mr. Dale disputes that he had shown any disrespect to any of his colleagues or acted inappropriately to anyone in any way.

86.     Regarding the email exchange that took place on August 29, 2019 with Mr. Dale's colleague, Steve Malley, Mr. Dale had repeatedly been denied credit for a particular deal that he had been involved in despite the program mandating that each sales representative get credit for their involvement in each Big 4 Partner deal.

87.     Mr. Dale reached out to the Big 4 firm to email Mr. Malley regarding this issue, which upset Mr. Malley because he thought that Mr. Dale was trying to go over his head.

88.     This challenged all future communications between them.

89.     Thereafter, when Mr. Dale was denied another credit, he brought it to the attention of Mr. Malley's manager to get another perspective on whether he was entitled to the credit, which further angered Mr. Malley.

90.     The next time they spoke, Mr. Dale suggested to Mr. Malley that he reach out to the Big 4 contact, and involve supervisors in future email exchanges, since they could not see eye to eye.

91.     Mr. Malley then complained that Mr. Dale was going over his head to seek credit approvals.

92.     This was the entirety of the relationship and exchange and did not reflect any disrespectful or inappropriate behavior by Mr. Dale in any way.

93.     Tellingly, however, a Big 4 Partner reported to Mr. Dale and another Vertex employee, Dave Homiak, that Mr. Cautilli had made disparaging comments about Mr. Dale at the Vertex Annual Customer Conference in Denver in 2019, and yet, unsurprisingly, Mr. Dale was never informed of any discipline or "Final Written Warning" issued to Mr. Cautilli for such disrespect (although, of course, Mr. Cautilli does not have Multiple Myeloma or any other disability of which Mr. Dale is aware).

94.     In October 2019, after twenty-four (24) successful years at Vertex, Mr. Dale was suddenly put on a Performance Improvement Plan ("PIP").

95.     Mr. Dale's PIP, unlike PIPs issued to other Vertex employees, contained provisions clearly designed to force Mr. Dale to resign.

96.     Upon Mr. Dale's inquiry, Mr. Cassidy admitted that the decision to put Mr. Dale on a PIP was made by Mr. Cautilli, based on his subjective discretion.

97.     Tellingly, despite Defendant's claims that Mr. Dale acted "inappropriately" at times, including in his "Final Written Warning," justifying his termination, nowhere in the PIP does it mention behavioral issues or problems.

98.     Notably, the PIP references entirely subjective "goals" such as "quota attainment," "territory process defined with consistent execution," "entitlement focus," identification of "Top 5 Q4 Pipeline accounts" and "outline an account plan with each," and "Partnership with Inside Sales."

99.     All of these goals included a plan for Mr. Dale and Mr. Cassidy to discuss, partner and/or review weekly.

100.     Mr. Dale sought to comply with every aspect of the PIP, including the weekly calls/reviews with Mr. Cassidy.

101.     However, on several occasions, Mr. Cassidy requested that the weekly call/review be skipped because he was busy doing other things.

102.     This further demonstrates that Mr. Cassidy, himself having worked closely with Mr. Dale for many years, had no concerns of his own about Mr. Dale's work ethic or performance, and did not feel the need to "coach" him, in contrast to what Mr. Cautilli indicated in the PIP.

103.     Mr. Cautilli's placement of Mr. Dale on a PIP further demonstrates the differential and discriminatory treatment to which Mr. Dale was being subjected.

104.     As noted above, Mr. Dale consistently met and/or succeeded quotas and was an incredibly successful employee.

105.     Conversely, during Mr. Dale's employment, there were numerous other sales representatives who were below quota and below Mr. Dale's "year to date" performance, who were not placed on a PIP.

106.     Moreover, for several prior years, although Mr. Dale's "year to date" performance was lower than expected through the third quarter, he was always able to exceed his quota goals in the final quarter.

107.     Mr. Dale was never put on a PIP or given a warning in any of those years.

108.     Mr. Cautilli's discrimination and harassment of Mr. Dale was further clarified by explicit comments made during the 2019 Vertex Exchange, Defendant's annual customer conference, to a Partner at Deloitte & Touche ("D&T"), a strategic consulting partner with whom Vertex conducted business for many years.

109.     When the D&T Partner stated that she was looking forward to working with Mr. Dale again, as he was one of her favorite people to work with, Mr. Cautilli made several disparaging gestures and stated, "good luck with that."

110.     The D&T Partner then reported these odd comments and the resulting awkward situation brought about by Mr. Cautilli to the Vertex – Deloitte Alliance Manager.

111.     As another example of the discriminatory and harassing treatment experienced by Mr. Dale, on another occasion, Mr. Cassidy was trying to coordinate a call with himself, Mr. Cautilli, and Mr. Dale about an account.

112.     Mr. Dale explained that he would not be able to attend the conference call at that time, as he had PTO (personal time off) for a doctor's appointment pertaining to his disability.

113.     Mr. Dale later learned that Mr. Cautilli was extremely angry that the conference call at his proposed time would have to be rescheduled due to Mr. Dale's medical needs.

114.   Mr. Cautilli's decisions had a negative impact on Mr. Dale's base salary, and he has also interfered with Mr. Dale's ability to seek other positions with Vertex.

115.   On October 10, 2020, Mr. Dale emailed Lisa Butler, CFO, and asked to meet in person or chat with her regarding a new position, Director of Procurement, that she had posted.

116.   Mr. Dale was scheduled to be in the Corporate Offices where Ms. Butler worked and suggested to meet while he was in town on October 15, 2019.

117.   Strangely, despite his excellent qualifications, Mr. Dale never heard from Ms. Butler regarding the new position.

118.   Ms. Butler's failure to respond to Mr. Dale or discuss the position with him made sense when Mr. Dale later learned from Mr. Cassidy that Ms. Butler had spoken to Mr. Cautilli about Mr. Dale's interest in the position.

119.   The treatment received by Mr. Dale is in stark contrast to the image (i.e., vision, values, mission) that Vertex claims in its messaging to the general public.

120.   On its website, Vertex claims that it gives its employees, among other things, "work-life balance; flexible scheduling; a casual dress code; and a fun collaborative work environment!" *See* https://www.vertexinc.com/company/careers/balance.

121.   Defendant website claims that its Values are "founded in a commitment to, and respect for, people," that Defendant culture is "grounded in treating each other with respect," that the workplace is centered around the belief that people should be "treated with respect," and that Defendant, among other things, "create[s] a collaborative work environment," "act[s] with integrity" and "thrive[s] on having a friendly and fun work environment!" *See* https://www.vertexinc.com/company/careers/balance.

122.     Thus, Defendant holds itself out to the world as friendly, fun, respectful and collaborative, with an excellent "work-life balance."

123.     Defendant's harassment and discrimination of Mr. Dale on the basis of his disability runs completely counter to these claimed values.

124.     As a result of the constant discrimination and harassment, Mr. Dale has suffered significant physical and emotional consequences.

125.     For example, in December 2019, Mr. Dale was diagnosed with Shingles, a condition directly resulting from the recent stress/duress he had experienced as a result of Mr. Cautilli's treatment.

126.     Mr. Dale had never had Shingles prior to December 2019.

127.     On November 8, 2019, Mr. Dale wrote an email to Defendant's Human Resources Department, noting his significant discomfort at work due to Mr. Cautilli's treatment of him based on his medical condition and disability.

128.     Mr. Dale did not receive any response whatsoever to his email.

129.     In fact, Defendant ignored Mr. Dale's complaints with respect to the harassment, discrimination and hostile work environment he had endured, contrasting sharply with the claimed family values that Defendant purports to have.

130.     Thereafter, Defendant purported to engage in a claimed "investigation," which did not address or resolve Mr. Dale's concerns in any way.

131.     Immediately after Mr. Dale's complaint of harassment and discrimination to Human Resources, Mr. Cautilli engaged in a number of retaliatory acts against Mr. Dale for having dared to complain about him.

132.     Among other things, Mr. Cautilli spoke poorly of Mr. Dale to several other Vertex employees, took every opportunity to criticize, berate and belittle Mr. Dale, and subjected Mr. Dale to several egregious acts of retaliation for having submitted his complaint of discrimination and harassment.

133.     In one example of his unjustified and clear acts of retaliation, Mr. Cautilli punished Mr. Dale by lowering his 2019 performance rating.

134.     Mr. Dale should have received a rating of "exceeds expectations" for that year, the highest possible rating, and his immediate manager, Mike Cassidy, recommended that rating for Mr. Dale.

135.     Mr. Dale's 2019 quota attainment was over 130%.

136.     However, despite this recommendation, Mr. Dale was given a lower rating, "strong contributor," after Mr. Cassidy's recommendation was rejected by Mr. Cautilli.

137.     This was particularly shocking and upsetting to Mr. Dale, given his excellent performance in both 2019 and in prior years' performances and ratings.

138.     Mr. Cassidy told Mr. Dale that Mr. Cautilli was the major proponent of Mr. Dale not receiving the higher performance rating.

139.     In his 25 years of employment with Vertex, Mr. Dale had always received the performance rating "exceeds" when he had exceeded 130% of his quota – except in 2019, when Mr. Cautilli had been employed at Vertex.

140.     In fact, Mr. Dale had even received the "exceeds" rating in years in which he had a lower quota attainment than 130%.

141.     On February 24, 2020, Mr. Dale wrote to Mr. Cautilli to express his disappointment and significant concerns about his 2019 Performance Rating.

142.     Mr. Dale specifically noted the negative tone of the review and focus on performance during early quarters rather than on annual results, and also noted that the review referenced performance plans that Mr. Dale had previously objected to.

143.     Mr. Dale further raised his concerns regarding the discrimination, harassment and retaliation which he was being subjected.

144.     The following day, Mr. Cautilli curtly responded that, to the extent Mr. Dale had questions regarding his review, Mr. Dale should reach out to his immediate supervisor, Mr. Cassidy; and if Mr. Dale had concerns about any unfair treatment, he should contact Human Resources.

145.     Per Mr. Cautilli's instructions, on or about March 4, 2020, Mr. Dale spoke with Mr. Cassidy regarding the review.

146.     That same day, Mr. Dale also forwarded his recent email exchange with Mr. Cautilli regarding his concerns about his review and the ongoing discrimination and retaliation to Human Resources.

147.     Notwithstanding the foregoing, Defendant still failed to address his concerns.

148.     Mr. Cautilli also engaged in acts of retaliation designed to negatively affect Mr. Dale's success at his employment, including preventing him from obtaining a promotion, refusing to raise Mr. Dale's salary despite the recommendation of Mr. Dale's immediate supervisor that he receive one, refusing to allow Mr. Dale earned credit, and taking away a substantial portion of Mr. Dale's territories, thus resulting in a significant amount of lost income.

149.     The lack of a raise was particularly concerning where there were several other sales representatives who had higher base salaries than Mr. Dale but had significantly inferior performance records.

150.    For the 2020 sales year, Mr. Dale lost over 50% of his sales territory.

151.    Although territories were being made smaller generally at Defendant, Mr. Cautilli exerted his influence to ensure that Mr. Dale's territory was reduced significantly more than other employees.

152.    In fact, Mr. Dale's territory was reduced by such a significant amount that Mr. Cassidy indicated his concern that Mr. Dale would not be able to meet his quota.

153.    Mr. Cassidy further noted that Mr. Cautilli had influence over the changes made to Mr. Dale's territory.

154.    Moreover, Mr. Cautilli gave additional territory to other employees (notably, to those who had not had as much territory taken away as Mr. Dale), but did not give any additional territory to Mr. Dale.

155.    On March 6, 2020, Mr. Cassidy resigned from his employment with Vertex.

156.    On March 17, 2020, Mr. Dale emailed Mr. Cautilli, indicating that he wanted to apply for Mr. Cassidy's open position and asking what the next steps would be to do so.

157.    In response, Mr. Cautilli stated only that nothing had been posted yet, he was "assessing" what to do with the role moving forward, and that he would keep Mr. Dale abreast.

158.    Notwithstanding the foregoing, Mr. Cautilli did not provide Mr. Dale any further information regarding his interest or application for the position.

159.    On June 3, 2020, Mr. Dale again emailed Mr. Cautilli, again expressing his interest in applying for the open position.

160.    Mr. Cautilli directed Mr. Dale to see the "minimum requirements" set forth in the newly created post for the position.

161.    In reviewing the newly posted position, Mr. Dale observed that the posted description for Mr. Cassidy's position had been changed considerably, such that it would be impossible for Mr. Dale to meet the criteria and obtain the promotion.

162.    Mr. Cautilli also refused to consider a raise for Mr. Dale in direct contravention of the recommendation of Mr. Cassidy. Mr. Dale's direct supervisor.

163.    Specifically, prior to his departure, Mr. Cassidy had recommended Mr. Dale for an increase in salary on the basis of long-term merit, as Mr. Dale had consistently exceeded his quota, had strong internal team member feedback, and had mentored several Vertex employees while maintaining strong alliances and relationships.

164.    Although Mr. Cassidy had proposed the salary increase to Mr. Cautilli prior to his departure from Vertex, Mr. Cautilli refused to respond to Mr. Dale's inquests regarding the status of the proposed salary increase.

165.    In another act of discrimination and retaliation, Mr. Dale placed an order per Mr. Cautilli's directives for one of his clients.

166.    However, when the client disputed the invoice, Mr. Cautilli approved the removal of the charge, which would negatively impact Mr. Dale's 2020 numbers.

167.    Mr. Dale requested that Mr. Cautilli consider allowing Mr. Dale to keep the credit, given that he followed Mr. Cautilli's instructions exactly; however, Mr. Cautilli claimed not to have made any such directives and refused to allow Mr. Dale the credit.

168.    Mr. Cautilli also constantly criticized and berated Mr. Dale on several occasions in further acts of harassment, discrimination and retaliation.

169.    On March 11, 2020, Mr. Dale had a call with Mr. Cautilli about a large competitive account.

170.     Despite several others being on the call, Mr. Cautilli was disrespectful and dismissive towards Mr. Dale throughout the conversation.

171.     In yet another example, on May 20, 2020, Mr. Cautilli wrote to Mr. Dale to "follow up" on a team call.

172.     Mr. Cautilli complained that Mr. Dale's presentation was "confusing," that Mr. Dale was "stuck" on issues when others got the message, and that Mr. Dale did not discuss the correct subject for the call.

173.     Mr. Cautilli then reminded Mr. Dale of the "Winning Way," which was meant to guide the Vertex employees, and of Mr. Cautilli's speeches regarding a "team mentality."

174.     On another occasion, on June 1, 2020, Mr. Cautilli emailed Mr. Dale to discuss their "working together," stating that there was a "lack of visibility until the very last minute where the expectation is to be on last minute calls with no advance notice."

175.     Ironically, even though Mr. Cautilli purported to complain about not getting enough advance notice on alleged calls, Mr. Dale had asked Mr. Cautilli on three (3) separate occasions to join a call several days prior and Mr. Cautilli did not respond until the last minute, with an evasive response.

176.     Mr. Dale responded to the email by requesting specific examples of his alleged tendency to provide last minute notice.

177.     Mr. Dale noted that he could only recall one incident where he added Mr. Cautilli to the invite shortly before the call, not because Mr. Cautilli was needed on the call, but for visibility and as an option if Mr. Cautilli wanted to join the call.

178.     Mr. Dale reminded Mr. Cautilli that the job constantly had last minute urgent calls with prospects and clients on a regular basis, and this was the nature of the job.

179.    Mr. Cautilli failed to respond with any examples of the alleged lack of notice.

180.    Thereafter, on a call to discuss the issue, Mr. Dale again asked Mr. Cautilli to provide examples of times in which Mr. Dale had not provided sufficient advance notice of a pending call.

181.    Mr. Cautilli again did not provide any examples.

182.    Instead, Mr. Cautilli became extremely angry, raised his voice, and yelled at Mr. Dale to "go ahead, go to Human Resources then."

183.    Not only was Mr. Cautilli's reference to Human Resources meant to mock Mr. Dale for having previously reported his concerns of discrimination and harassment to Human Resources, but it was a flagrant and obvious reminder that he was still angry and resentful towards Mr. Dale for having originally gone to Human Resources to report his complaint.

184.    Most recently, on June 17, 2020, Mr. Dale wrote an email regarding an urgent issue that could result in a loss of a tremendous sales opportunity for Defendant.

185.    Mr. Dale's email detailed the specific issue, noting that Mr. Cautilli had demanded modifications to certain language in the parties' agreement, which language the client did not approve, particularly where the prior language had been agreed to by the parties the year prior.

186.    Mr. Dale stated his disagreement with Mr. Cautilli's approach and requested the opinion of Chris Jones, Vertex Chief Revenue Officer and Mr. Cautilli's direct supervisor.

187.    Mr. Dale further noted that, due to this sudden demand for different language, his relationship with the client was being questioned and his opportunity for the new sale was in jeopardy.

188.     After Mr. Cautilli replied with inaccurate and evasive information, Mr. Dale responded that Mr. Cautilli's email left out pertinent information, that he and Mr. Cautilli had been unable to agree on the issue, and that resolution of the issue required Mr. Jones' input.

189.     Mr. Dale did not act inappropriately in any way with respect to the email exchange.

190.     Specifically, Mr. Dale and Mr. Cautilli had spoken earlier that day, and Mr. Cautilli had changed what he said to Mr. Dale when he emailed the group.

191.     Thus, on this very long email exchange with those directly involved in the account, Mr. Dale responded to the email solely to note Mr. Cautilli's contradictory statements, stating that: "Carlo's email below is somewhat dishonest because we just discussed..."

192.     This was in no way meant to be disparaging, and it was not disparaging.

193.     The email simply pointed out that the statement made by Mr. Cautilli in the email differed from what he had told Mr. Dale when they spoke earlier that day.

194.     Mr. Jones indicated that he would take part on a call with Mr. Dale and Mr. Cautilli, but that Mr. Dale's "tone and tenor" of the call (i.e., calling out Mr. Cautilli for his dishonest and misleading statements) was inappropriate.

195.     Also on June 17, 2020, Mr. Dale again contacted Human Resources to note additional instances of harassment, discrimination and retaliation to which he had been subjected, including his lack of response for a raise, Mr. Cautilli's anger that he went to Human Resources, Mr. Cautilli's refusal to provide any examples of inadequate notice for calls, Mr. Cautilli's refusal to allow Mr. Dale credit despite his instructions, several instances of Mr. Cautilli speaking poorly of Mr. Dale to others, and Mr. Dale's significant territory reduction by Mr. Cautilli.

196.    Immediately after this email to Human Resources, despite his extensive record of excellent service and achievements for Defendant, Mr. Dale was terminated.

197.    Defendant claimed that the reason for his termination was the email exchange between Mr. Dale, Mr. Cautilli and Mr. Jones regarding Mr. Dale's criticisms of Mr. Cautilli regarding his handling of the potentially lost sales opportunity and misleading emails.

198.    The alleged grounds for Mr. Dale's termination were pretext for discrimination and retaliation.

199.    The timing of Mr. Dale's termination, which occurred immediately after he provided further instances of the discriminatory and retaliatory acts to Human Resources, coupled with the several obvious acts of harassment, discrimination and retaliation engaged in by Mr. Cautilli, and Defendant's unjustified grounds for his termination, indicates that Mr. Dale's termination was the result of discrimination on the basis of his disability and/or perceived disability and retaliation for his complaints of the harassment, discrimination and retaliation.

200.    Given his exemplary work performance during his employment with Defendant, Defendant's treatment of Mr. Dale after his complaints of discrimination and harassment, and the circumstances surrounding his termination, Mr. Dale maintains that he was discriminated against and harassed on the basis of his disability and/or perceived disability, was subjected to retaliation for his complaints, and was terminated as a result of discrimination and retaliation.

201.    Mr. Dale has suffered mental anguish and severe emotional distress as a direct and proximate result of the actions and inactions of Defendant.

202.    Defendant and its agents acted with the intent of causing or with reckless disregard for the probability that their actions would cause Mr. Dale severe emotional distress.

203.     Mr. Dale has suffered financial losses, which include, among other things, lost wages, medical expenses, and an obligation for attorneys' fees and costs of bringing suit, as a direct and proximate result of the actions and inactions of Defendant.

## COUNT I
### The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.

204.     Plaintiff Ed Dale repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

205.     Based on the foregoing, Defendant has engaged in unlawful employment practices in violation of the Americans with Disabilities Act.

206.     In discriminating against and harassing Mr. Dale on the basis of his disability and/or because Defendant regarded Mr. Dale as disabled, and in retaliating against Mr. Dale for his complaints about the discrimination and harassment, Defendant violated the ADA.

207.     Said violations were intentional and willful.

208.     Said violations warrant the imposition of punitive damages.

209.     As the direct and proximate result of Defendant's violation of the Americans with Disabilities Act, Plaintiff Ed Dale has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## PRAYER FOR RELIEF

210.     Plaintiff Ed Dale repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Ed Dale respectfully requests that this Court enter judgment in his favor and against Defendant Vertex, Inc., and Order:

a.   Appropriate equitable relief, including reinstatement or front pay;

25

b.  Defendant to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination, harassment, and wrongful termination;

c.  Defendant to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of Defendant's unlawful conduct;

d.  Defendant to pay Plaintiff punitive damages;

e.  Defendant to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

f.  Defendant to pay Plaintiff's costs of bringing this action, including, but not limited to, Plaintiff's attorneys' fees;

g.  Plaintiff be granted any and all other remedies available under the ADA; and

h.  Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff Ed Dale hereby demands trial by jury as to all issues so triable.


BELL & BELL LLP

By:     */s/ Christopher A. Macey, Jr.*
        Christopher A. Macey, Jr., Esquire
        One Penn Center
        1617 JFK Blvd. – Suite 1254
        Philadelphia, PA 19103
        (215) 569-2285

        *Attorneys for Plaintiff Ed Dale*

Dated: October 22, 2021